JAMES B. O'CONNOR V. STATE OF NEBRASKA.

FILED OCTOBER 1, 1923. No. 23125.

1. **Criminal Law**: CIRCUMSTANTIAL EVIDENCE. When it is sought to establish the guilt of the accused in a criminal case by circumstantial evidence, it is not sufficient that the facts create a probability, though a strong one. If, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.

2. **Forgery**: UTTERING FALSE WILL: BURDEN OF PROOF. In a prosecution for uttering a false will as. true and genuine knowing the. same to be false, with intent to defraud, and the theory of the prosecution is that the will was recently drawn by the accused or some one in collusion with him and dated back, and the instrument carries upon its face evidence inconsistent with such theory, the burden is upon the state to overcome such evidence by proof beyond a reasonable doubt.

ERROR to the district court for Adams county: LEWIS H. BLACKLEDGE, JUDGE. *Reversed*.

*James M. Johnson, F. P. Olmstead, Bernard McNeny* and *James & Danly,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *W. T. Thompson, contra.*

Heard before LETTON, DEAN, ALDRICH, DAY and GOOD, JJ., BUTTON, District Judge.

BUTTON, District Judge.

James B. O'Connor is charged in the information with the offense of uttering a false and forged will. On this charge he was convicted in the district court for Adams

county, and sentenced to the penitentiary. He prosecutes error to this court.

The theory of the state is that this alleged will of John O'Connor was forged, after the death of John O'Connor, by James B. O'Connor or some one implicated with him, and dated back to a time prior to the death, and that the motive was to obtain the fortune left by the deceased. This theory of the state permeates the whole record and constitutes the warp and woof relied upon by the state to hold together and sustain this prosecution and conviction. In the language of the state's brief this theory is expressed as follows:

"The testimony shows that the accused was the first claimant to file a claim of heirship in the county court to John O'Connor. He had taken an active part in the original attempt to probate the will, now involved, in the county court. He was present at all of the many trials involving the estate of the deceased, both in connection with questions of heirship and with those involving wills. He had observed the weak and the strong points in all the proceedings. He was familiar with the local surroundings. He knew what would appeal to the sentiments and feelings, the likes and prejudices of the people of the community respecting any will that might be brought forward, purporting to be the will and testament of John O'Connor. No one was better qualified than he to draft a will that would reflect his eccentric characteristics. Does not the instrument involved attempt to reflect these characteristics and to fit into the local surroundings? No one was more able to make it do so than the accused."

The state has consistently adhered to the above theory at all times and must now stand or fall by this theory, as it has not attempted to establish the alleged forgery of this will at any other time or in any other way.

The will in question was acknowledged before a notary public. Our statute does not require a will to be acknowledged, neither does it forbid it. Hence, a testator

would have the right to have his will acknowledged as an additional means of identification of the instrument. The statute requires but two witnesses to a will, but does not forbid a greater number. If a greater number do witness a will, all are competent to testify. In the same way, the presence of an acknowledgment to a will, the seal and the signature of the notary are all competent to identify the will and must be considered. If a will is unquestioned, the certificate of acknowledgment may be treated as surplusage. However, if genuine, it proves conclusively that the notary was alive at the time he signed the certificate and attached his seal. If he later dies and claim is made that the will was recently drawn and dated back, and the state adopts this theory in a prosecution for forgery, in order to establish the falsity of the will beyond a reasonable doubt, the prosecution must refute the evidence furnished by the work of the notary by proof beyond a reasonable doubt.

We now come to a discussion of the evidence in this case. Watkins, the notary, died August 5, 1909. In the administration of his estate Judge Amick acted as attorney. Within 30 days after the death of Watkins his library and desk and notarial seal were moved to the office of Judge Amick. The seal remained in the possession of Judge Amick until this litigation came up, when search was made for it. Judge Amick found the seal in the right-hand lower drawer of the desk he obtained from Watkins' office about 30 days after Watkins' death. The seal was closed and rusted together and bore evidence of having been in this condition for a long time. The judge was unable to open the seal and took it to a mechanic. The mechanic took out the lever pin and broke the seal apart. An impression of the seal was taken upon a piece of paper and is now in the record. It proved to be the seal of Watkins and the same as the impression upon the will. This identical seal was not used on the will in question recently, as

it was in the possession of Judge Amick and not available to the accused nor any one else. And the seal was unworkable, also, until broken apart by the mechanic at Judge Amick's request.

As to the signature of the notary, Judge Amick says he knew Watkins for 25 years before his death; says he had assisted Watkins many times in the trial of cases; says he knew the way Watkins dressed, how he walked and how he looked, and then says he knew his handwriting as well as he knew his face, and gait, and says the signature to the certificate to the will is the genuine signature of Watkins. And to make his judgment doubly sure, he says he went to the courthouse and found numerous signatures of Watkins, known to be genuine, and made a critical examination of the questioned signature in comparison with the genuine, and again pronounced the signature, to the certificate to the will, the genuine signature of Watkins. Watkins' wife says the signature to the certificate to the will is the genuine signature of her deceased husband. The two witnesses to the will say they saw Watkins sign his name to the certificate. Also Yeager and Brown pronounced the signature genuine. In addition to all this, the record contains numerous signatures of Watkins, admitted by all to be genuine, so that the court may also make a comparison with the signature of Watkins to the certificate to the will, which is also in the record.

Against this testimony we have the opinion of an expert witness. He thought the signature of Watkins to the acknowledgement not only spurious, but also thought it the handwriting of the accused. Another expert, fully as competent, came to the opposite conclusion. The record shows that the first expert testified in another case that the name John O'Connor, signed in Albany, New York, 50 years ago, was the handwriting of John O'Connor who signed certain papers admitted to be the handwriting of John O'Connor of Hastings, Nebraska. After reading his cross-examination, and con-

sidering the entire record, we are of the opinion that the testimony of this witness with the other testimony in the record still leaves more than a reasonable doubt as to the guilt of the accused.

While it was not necessary for the state to show that the accused actually wrote the signature to the will in question, because he was charged with uttering a forged instrument, still it was the theory of the state that the accused did in fact write the signature to the will as well as the signature of the notary. The state attempted to prove this fact to show guilty knowledge on the part of the accused in uttering the instrument. To do this the state called expert witnesses, not only to show that the deceased did not sign the will, but the further fact that the accused did.

The opinion of an expert that a certain signature to an instrument, claimed as spurious, was not written by the same person whose genuine signature he has examined, has probative value. But Mr. Osborn says: "When a signature is shown to be fraudulent, the question naturally arises as to who committed the forgery. This question is usually asked in every such case, but cannot often be answered with much certainty, judging from the writing alone. It is much easier to show that a fraudulent signature is not genuine than it is to show that such a writing is actually the work of a particular writer." Osborn, Questioned Documents, p. 13.

The state offered in evidence a letter of the accused to Mrs. Watkins. This letter was dated November 4, 1917. The letter shows a knowledge of the disputed will. The will was not opened and read in the county court until November 19, 1917. This was a damaging circumstance, if true, for it proved guilty knowledge. But, was it true? This letter was dictated to a stenographer. The stenographer was called as a witness. She testified the letter was written at the time of its dictation, and she produced the book containing her original notes. The letters in her note-book before and after

O'Connor v. State.

this letter bear consecutive dates before and after November 24, 1917, and there is no indication of tampering with the book or the dates. This book is now a part of the record in this case and bears internal evidence that it is genuine. If the stenographer is to be believed, this evidence is conclusive that this letter was actually written five days after the will was opened, instead of 15 days before.

. The witnesses to the will also wrote some letters to District Judge Corcoran. We have examined them and find nothing in the letters to indicate collusion or any corrupt motive. We suppose that, while time lasts, some people will continue to talk and write foolishly. A district judge gets many letters that ought not to have been written. Judge Corcoran did not consider the letters of sufficient importance to answer any of them. No witness was produced to speak against the reputation for truth and veracity of either of these witnesses. Neither witness is an educated man and neither seems capable of carrying out any scheme to defraud.

Now, could this will have been falsely made and these witnesses and Mr. Watkins deceived? It is possible, but highly improbable. The accused could have gotten some one to simulate John O'Connor on October 10, 1908, the date the will bears. But what motive could prompt him? John O'Connor was living at that time. The will of a living man is of no value, and is not even the subject of forgery. *Huckaby v. State,* 45 Tex. Cr. Rep. 577. A later will by O'Connor would revoke such a will without the necessity of proving it spurious. But we need waste no time on conjecture. The state has a different theory, and if the above theory had been adopted the burden would have been on the state to prove it beyond a reasonable doubt, and it finds no support in the evidence.

Was it possible to have produced this will recently and dated it back in some way other than contended for? To do it one would have to take a genuine impression of

Mr. Watkin's seal and have a seal made like it. Then the signature of Mr. Watkins would have to be forged. All this would be almost impossible. But, again, we are not concerned with this theory, as the state adopted a different one. If the above theory had been adopted, again the burden would have been upon the state to establish it beyond a reasonable doubt, and the evidence does not support such a theory.

We will not examine into the state's evidence that John O'Connor was at home, in Hastings, at the time this will was drawn. Suppose this fact were established, it gets us nowhere. The burden would still be upon the state to prove beyond a reasonable doubt that the impression of the notarial seal on the will and the signature of the notary were spurious. The state has not succeeded in doing this. On the other hand, the defense has shown the seal to be genuine almost to a mathematical certainty, and the genuineness of the signature of the notary seems to be established.

It will serve no useful purpose to examine the assignment of errors of law and we shall not do so.

We wish, in passing, to call attention to the case *In re Estate of O'Connor*, 105 Neb. 88. In this case the will herein involved was offered for probate. The evidence in the probate proceedings was the same in many respects as now before the court. In the probate proceedings the state was not a party, and only one question was involved, to wit: Was the instrument offered for probate the last will and testament of John O'Connor deceased? The district court said it was, a majority of the supreme court said it was not. Being a civil case, this question turned on the preponderance of the evidence alone, and did not require proof beyond a reasonable doubt, as it required in such a prosecution as this. Neither the note-book nor the testimony of the stenographer were in evidence at the trial of the civil case, and what then seemed to be a fact—that the letter, dated November 4, was written before the contents of

O'Connor v. State.

the will could have been known to the writer, if it was the genuine will of John O'Connor—had great influence on the minds of some of the members of the court in deciding in that case that it was a forgery. That this was an error in the date is now established. The law of the present case is that the defendant is presumed to be innocent of crime until his guilt is established by the evidence beyond a reasonable doubt. We think that in this case this has not been done, even though a preponderance of the evidence in the former case led the majority of the court to the conclusion that the will was forged. The evidence for the state in this case is partly circumstantial in its nature and partly consists of the opinions of witnesses as to the genuineness of the signature to the will. When it is sought to establish the guilt of the accused in a criminal case by circumstantial evidence, it is not sufficient that the facts create a probability, though a strong one. If, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.

Under these well-settled principles, we are convinced that the evidence as produced in this, a criminal case, is not sufficient to uphold a conviction.

The judgment of the lower court is

REVERSED.

GOOD, J., dissenting.

I have no criticism to make of the principle of law announced in the syllabus of this case, but, after a careful examination of the record, I am unable to concur in the view of the majority of the court that the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt.

In my opinion, the evidence establishes the fact that

the will in question was a forgery, and that the defendant in this case, with knowledge thereof, attempted to procure its probate with intent to defraud, and was therefore guilty of uttering a false will as true and genuine, knowing the same to be false. No error in any ruling of the court or in any instruction is pointed out in the opinion. The reversal is based solely upon the question of fact. The jury, as well as the trial judge, saw the witnesses and their manner of testifying, and were better able to judge of the credibility of the witnesses than is this court. At most, it is a case in which there was some conflict in the evidence. It seems to me that the holding of the court is invading the province of the jury.